AUDREY STRAUSS
United States Attorney for the
Southern District of New York
By: LAWRENCE H. FOGELMAN
     PIERRE G. ARMAND
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2719/2724
Fax: (212) 637-2717
E-mail: Lawrence.Fogelman@usdoj.gov
        Pierre.Armand@usdoj.gov

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

WELLS FARGO BANK, N.A.,

        Defendant.

Case No. 21 Civ. _____

**COMPLAINT**

Plaintiff the United States of America, by its attorney, Audrey Strauss, United States Attorney for the Southern District of New York, alleges upon information and belief as follows:

## INTRODUCTION

1.      This is a civil fraud action brought by the United States under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 18 U.S.C. § 1833a, to recover civil monetary penalties from defendant Wells Fargo Bank N.A. ("Defendant," "Wells Fargo" or the "Bank") for fraudulently overcharging hundreds of its commercial customers who used the Bank's foreign exchange ("FX") services.

2.      Specifically, from 2010 through 2017 (the "Covered Period"), Wells Fargo defrauded 771 of its commercial customers (referred to herein as "the Customers") who used the Bank's FX services—many of them small or medium-sized businesses or federally-insured financial institutions—in violation of the mail fraud, wire fraud, and bank fraud statutes, 18 U.S.C. §§ 1341, 1343, 1344, by (i) falsely representing to the Customers that the Bank would charge and/or was charging certain fixed FX spreads or sales margins on the Customers' FX transactions with the Bank (which the Bank sometimes referred to internally as "fixed-pricing agreements"), (ii) financially incentivizing its FX sales specialists to overcharge the Customers while failing to take steps to ensure that FX sales specialists would comply or were complying with fixed-pricing agreements, and (iii) systematically charging the Customers higher FX spreads or sales margins than Wells Fargo represented it would charge and/or was charging in fixed-pricing agreements or otherwise, while concealing the overcharges from the Customers.

3.      Through this brazen and wide-ranging fraud, Wells Fargo was able to secretly obtain tens of millions of dollars from the Customers to which the Bank was not entitled.

## PARTIES

4.      Plaintiff is the United States of America.

5.      Defendant Wells Fargo is a federally-insured financial institution with headquarters located in Sioux Falls, South Dakota.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1833a.

7.      Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant conducts business within this District and because a

substantial part of the events and omissions alleged in this Complaint occurred within this District.

## BACKGROUND

### A.    FIRREA

8.      In 1989, Congress enacted FIRREA as part of a comprehensive legislative plan to reform and strengthen the federal deposit insurance system.  Pursuant to FIRREA, the United States can recover civil penalties from persons who "violate any provision of law to which this section is made applicable." 12 U.S.C. § 1833a(a) - (b).  Further, if a defendant "derives pecuniary gain from the violation, or if the violation results in pecuniary loss" to a person other than the defendant, FIRREA authorizes the United States to recover civil penalties in an amount equal to the amount of gain or loss.  *Id.* § 1833a(b)(3)(A).

9.      As relevant to this action, FIRREA authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, three provisions of Title 18 of the United States Code:

> •    18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution): which proscribes the use of "the Postal Service, or . . . private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . .";

> •    18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution): which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . ."; and

> •    18 U.S.C. § 1344 (Bank Fraud): which proscribes the "knowing execut[ion of] or attempt[ed] ... execute[ion of] a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises".

**B.**    **Wells Fargo's FX Business**

10.    Wells Fargo offers, among other financial products and services, FX services to commercial customers located throughout the United States, including customers located in the Southern District of New York.

11.    During the Covered Period, Wells Fargo offered FX services to its customers, many of which were small or medium-sized businesses or federally-insured financial institutions located throughout the United States.  For example, when customers needed to send wire transfers overseas, Wells Fargo would convert the customers' U.S. dollars into foreign currency.  Likewise, when customers received wire transfers from overseas, Wells Fargo would convert foreign currency into U.S. dollars.

12.    Wells Fargo profited from conducting FX transactions with its customers by marking up the prices on currency it was selling and marking down the prices on currency it was buying from customers for their outgoing and incoming wire transfers.  For example, Wells Fargo might add a 0.5% (or 50 basis points) mark-up to the rate at which a particular currency was trading at the time of the transaction.  Wells Fargo employees referred internally to this currency mark-up as a "spread" or "sales margin."

13.    Wells Fargo frequently made representations to customers about the way the Bank would price or was pricing their FX transactions.  Pursuant to such representations, sometimes referred to internally by Wells Fargo employees as fixed-pricing agreements, Wells Fargo's FX sales specialists stated to customers that the Bank would charge or was charging specific spreads or sales margins on their FX transactions. In some cases, the FX spread would be fixed for all of the customer's transactions.  In other cases, the FX spread varied based on, *inter alia*, the currency pair, transaction type, or the amount of currency being exchanged.

4

Regardless, the Bank advised customers that it would not impose or was not imposing higher spreads or sales margins than what was represented to customers.

14.      Many of these fixed-pricing agreements were memorialized in writing, typically via email. Other such agreements were oral in nature, where the FX sales specialist represented to a customer that the Bank would charge a particular fixed spread. During the Covered Period, Wells Fargo entered into fixed-pricing agreements with hundreds of its customers.

15.      Wells Fargo's FX sales specialists frequently recorded the terms of these fixed-pricing agreements on an internal system called the Customer Management Reporting database or "CMR." This database served as a repository of notes about FX customers and was accessible to Wells Fargo FX employees and supervisors to determine how the Bank should price a given customer's FX transactions. CMR notes sometimes included excerpts of emails between customers and the Bank establishing the fixed-pricing agreement. Other CMR notes simply described the terms of a fixed-pricing agreement between the Bank and the customer.

16.      Many of Wells Fargo's customers used the Bank's online FX trading systems to exchange currency for outgoing wire transfers. Two of the online FX trading platforms that Wells Fargo offered to customers were "FX Online," or "FXOL," and the "Commercial Electronic Office Wires" or "CEO Wires". The FXOL and CEO Wires services operated in a similar way. On each platform, the customer could login, make a request to exchange U.S. dollars for another currency, and arrange to send that currency by wire transfer to a recipient overseas. Wells Fargo would quote an exchange rate for the amount and type of currency, which the customer could accept or reject.

17.      Generally, Wells Fargo disclosed only the "all in" FX rate to the customer, meaning Wells Fargo disclosed only the final FX rate, not the underlying market rate or the

spread/sales margin the Bank was charging for the transaction. Accordingly, it was difficult for customers with fixed-pricing agreements to verify that the Bank was in fact charging the represented sales margin on these transactions.

18. When Wells Fargo received incoming wire transfers for its customers, referred to internally as "BSwift" wires, Wells Fargo frequently did not offer customers an exchange rate that they could accept or reject before executing the transaction. Furthermore, Wells Fargo frequently did not inform customers of the time when Wells Fargo had received and converted the BSwift wires. Rather, Wells Fargo would execute the FX transaction and later notify customers of the FX rate it had applied. Without knowing when Wells Fargo received the wire transfers, or when the Bank executed the transactions, it was even more difficult for customers to verify whether Wells Fargo was imposing spreads/sales margins that were consistent with its pricing representations.

**WELLS FARGO'S SCHEME TO DEFRAUD**
**FX CUSTOMERS WITH FIXED-PRICING AGREEMENTS**

### A. Wells Fargo Fraudulently Charged Customers Higher Spreads or Sales Margins Than It Represented

19. During the Covered Period, many Wells Fargo FX sales specialists systematically and fraudulently overcharged hundreds of the Bank's commercial customers by repeatedly applying larger sales margins or spreads to customer FX transactions than they represented the Bank would charge and/or was charging.

20. As reflected by the entries and information in Wells Fargo's own internal CMR database, FX sales specialists routinely defrauded customers by charging higher spreads on FX transactions than the Bank represented in fixed-pricing agreements or otherwise. The CMR notes plainly reveal that while customers thought they would receive and/or were receiving the

6

rate that the Bank represented to customers, the Bank in fact was surreptitiously charging the customers higher spreads. Indeed, Wells Fargo FX sales specialists routinely charged customers spreads that were as high as they thought they could get away with.

21.    For example, Wells Fargo agreed to charge Customer A a spread of 25 pips[1] on certain FX trades. However, the notes in the CMR database show that, contrary to this agreement, the Bank would actually charge a spread of 30-35 pips "if possible." Customer A did not realize that it was being charged a higher spread than what the Bank had represented. Indeed, the FX specialist noted in the CMR database that "customer still thinks pricing is the same."

22.    Another CMR note concerning Customer B indicated that the Bank was fraudulently charging the customer "0.18 pips," despite the fact that the "customer thinks they are only charged 15pips." A third CMR note indicated that the Bank was fraudulently charging Customer C a spread of 1.4%, but that Customer C thought the Bank was charging a spread of only 1.25%.

23.    CMR notes also showed that sometimes, rather than adhering to agreements with customers to apply a fixed spread to a market rate for a currency pair at the time of the transaction, FX sales specialists would instead assign the least favorable price to the customer from the range of market price fluctuations during the trading day up until the time of the transaction. This practice was sometimes referred to as "range of day" pricing. Through this practice, FX sales specialists were able to take advantage of customers and generate larger spreads on FX transactions. Sometimes, the FX sales specialists would choose either the range-

---

[1]   A "pip," short for "point in percentage," is a standardized unit representing the smallest amount by which a currency pair can change. It is usually 0.0001 for currencies quoted in U.S. dollars; thus, 25 pips on such a pair would equal 0.0025.

of-day price or apply an inflated spread to a current market price depending on which pricing scenario was more favorable to the Bank. In other instances, FX sales specialists would use the range-of-day price as an outer boundary or cap on the amount to overcharge customers.

24.     For example, in a CMR note concerning Customer D, an FX sales specialist wrote after the word "External," that Customer D and the Bank "agreed to .25%" as the spread that the Bank would apply to Customer D's FX transactions. Nevertheless, contrary to this agreement, the CMR note indicates that the Bank would fraudulently charge a spread of between 0.30% and 0.50% not to exceed the range of the day, explicitly stating: "INTERNAL: Spread .30% OR range whatever is greater but ***Don't take more than .50% with range cap***".

25.     Similarly, an FX sales specialist noted with respect to Customer A that for certain transactions, the bank would "stay within [the]range of the day" and that if the transaction was "large," the bank "c[ould] take up to 25 pips from [the] high of the day."

26.     In certain instances, when customers contacted the Bank to inquire about higher-than-agreed-upon pricing, FX sales specialists would give false explanations for the prices, such as "time fluctuations," meaning fluctuations in price during the day, or other supposed events in the market that purportedly caused a change in the exchange rate.

**B.     Wells Fargo Provided Customers False Market Data in Order to Conceal Overcharges Imposed on FX Transactions**

27.     FX sales specialists sometimes provided customers false transaction data in order to conceal overcharges that they applied to FX transactions. Specifically, to create a false impression that the Bank had applied the represented fixed spread when it had not done so, FX sales specialists sometimes supplied false underlying FX market rates and spread calculations.

28.     For example, in one instance, an FX sales specialist represented to Customer E that the Bank would charge a spread of 15 basis points for all transactions below $100,000, and a

spread of 5 basis points for all transactions above $100,000.  Contrary to this agreement, the Bank fraudulently charged higher-than-agreed-upon spreads on a series of FX transactions. Then, in email correspondence with representatives of Customer E, the FX sales specialist provided inaccurate underlying market rate information and spread calculations to the customer to make the FX spread falsely appear consistent with the agreement terms.

29.     In another example, an FX sales specialist agreed to apply a 50 basis point spread to Customer F's FX transactions.  However, the FX sales specialist fraudulently applied spreads of more than 50 basis points to a series of Customer F's transactions and then provided inaccurate underlying market rate information to Customer F to make the FX spread falsely appear consistent with the agreement terms.

### C.     Wells Fargo Used the "Big Figure Trick" to Defraud Customers

30.     For some customers, FX sales specialists also used what they internally called the "big figure trick" or the "transposition error game" to increase the FX sales margin and their profits.  To carry out this scheme, the FX specialist would intentionally transpose the digits in the price of the transactions in a way that would result in the customers paying Wells Fargo a higher spread or sales margin.

31.     For example, hypothetically, if the actual correct price to purchase a Euro was 1.0123 dollars, an FX sales specialist would use the big figure trick to switch the price to 1.0213 dollars, thus taking more spread (in this example, an additional 89 basis points) from the customer.

32.     If the customer actually caught the error, the FX sales specialist would falsely claim that it was simply a mistake.

33. One FX sales specialist explained in an internal communication with colleagues: "You can play the transposition error game if you get called out." Another FX sales specialist noted to a colleague regarding a previous transaction that a customer "didn't flinch at the big fig the other day. Want to take a bit more?"

**D.  Wells Fargo Took Particular Advantage of Unsophisticated Customers**

34. At times, Wells Fargo's FX sales specialists charged the same customer different spreads depending on which representative of the customer happened to be involved in executing the trade. Specifically, Wells Fargo's FX sales specialists would charge larger spreads on transactions requested by certain customer representatives thought to be less sophisticated or experienced in FX trading.

35. Wells Fargo was able to charge larger spreads on FX transactions initiated by particular customer representatives because the Bank's online trading platforms identified the individuals who were requesting FX trades. This practice was referred to internally at Wells Fargo as "user-based pricing."

36. For example, an FX sales specialist consistently charged Customer G significantly larger spreads than the parties had agreed upon. However, when an employee of Customer G who had a higher degree of sophistication or experience in FX trading was involved in executing the transactions, the FX sales specialist charged smaller spreads (albeit still sometimes larger than the agreed-upon spread).

**E.  The BSwift "Piñata"**

37. As noted above, because Wells Fargo generally did not provide immediate notice to customers when they received incoming wires, known as BSwifts, Wells Fargo's FX sales

specialists took advantage of this time delay to charge higher spreads than the Bank had represented it would.

38.     One method used by FX sales specialists to extract large sales margins on BSwift transactions was to price them based on the range of the day.  This practice allowed FX sales specialists to generate even larger spreads on incoming wire transactions than on outgoing wires. With outgoing wires, FX sales specialists could select the best price for the Bank and the worst price for the customer only from the beginning of the trading day up until the time of the transaction.  However, with BSwift wires, because the customers generally did not know when the funds arrived in their accounts or when they were converted, the FX sales specialist could wait until the end of the day and cherry-pick the best rate for the Bank and the worst rate for the customer from the entire trading day.

39.     In a written instant message to a colleague, an FX sales specialist analogized this fraudulent scheme to getting candy from a piñata, referring to the Bank's pricing of BSwift wire transfers as the "BSWIFT pinata."

40.     Another FX sales specialist observed in an internal email communication that customers would not notice these overcharges on BSwift wires.  He wrote, after noting that he "bumped spreads up a pinch," that "these clients who are in the mode of just processing wires will most likely not notice this slight change in pricing" and that it "could have a very quick positive impact on revenue without a lot of risk."  For example, in a CMR note concerning Customer H, an FX sales specialist documented a "[r]ate agreement" under which the customer would be charged 10 basis points on incoming wires.  However, contrary to this agreement, Wells Fargo charged Customer H higher spreads for incoming wires.  Indeed, the FX sales specialist acknowledged in a note recorded in the CMR database that "if good ranges I may want

to take a bit more." The FX sales specialist also gave an instruction that while she was traveling, the FX sales specialist covering the client should use the "range of day" and "big figure" pricing.

41.     Another FX sales specialist noted in a recorded call with a colleague that she preferred to book her own BSwifts so that she could take more spread because she was doing the pricing herself. She observed that she could "dance around it" if the customer called with questions.

### F.     Wells Fargo Created an Atmosphere that Facilitated the Fraud

42.     By giving improper financial incentives to FX sales specialists to prioritize maximizing FX revenue over all else, while simultaneously providing no meaningful or effective oversight to prevent its employees from fraudulently overcharging customers, Wells Fargo created a work environment in which defrauding or otherwise taking advantage of customers became normal business practice.

43.     Wells Fargo incentivized its FX sales specialists to generate as much FX sales revenue as possible by tying their bonuses exclusively to the amount of sales revenue they generated for the Bank from FX transactions. Specifically, before 2017, Wells Fargo paid bonuses to FX sales specialists based solely upon the percentage of the FX sales revenue that each FX sales specialist and FX desk generated. Each year during the Covered Period, Wells Fargo paid hundreds of thousands of dollars in bonuses to various FX sales specialists based on FX revenue. Some FX sales specialists received bonus compensation exceeding $1 million in a single year.

44.     Compounding these improper financial incentives, prior to 2017, Wells Fargo failed to put any meaningful or effective safeguards in place to ensure that FX sales specialists

priced customer FX transactions in accordance with the terms represented in fixed-pricing agreements.

45.     For example, Wells Fargo:  (a) had no meaningful or effective policies or procedures governing how fixed-pricing agreements should be negotiated, memorialized, recorded, or implemented; (b) provided no training to FX sales specialists concerning fixed-pricing agreements; (c) had no meaningful or effective process to systematically track the existence or terms of fixed-pricing agreements; (d) had no systemic mechanism in place to monitor whether FX sales specialists were pricing FX transactions in a manner that was consistent with fixed-pricing agreements; (e) did not implement any electronic safeguards that would have prevented FX sales specialists from pricing transactions in a manner that deviated from fixed-pricing agreements; and (f) did not conduct any audits or reviews of FX transactions to determine whether FX pricing matched fixed-pricing agreements.

46.     As a result of the improper incentives and lack of oversight, a culture developed in which Wells Fargo FX sales specialists were comfortable repeatedly defrauding the Bank's customers.  FX sales specialists openly discussed and even celebrated transactions resulting in larger FX spreads than agreed to with customers and transactions generating large FX revenue.

47.     For example, FX sales specialists on Wells Fargo's San Francisco FX desk would celebrate transactions with large spreads or sales margins by ringing a bell located on the trading floor.  Other FX sales specialists would use expressions such as, "back the truck up," and "when in doubt, spread them out," to jokingly describe how Wells Fargo and its FX sales specialists were making large sums at the expense of the Bank's customers.  Another FX sales specialist referred to Wells Fargo's FX sales group as a "bucket shop."

* * * * *

13

48.     As a result of the foregoing fraudulent scheme, Wells Fargo unlawfully obtained millions of dollars from customers with fixed-pricing agreements.

### G.     The Fraud Involved Interstate Mail and Wires, and Affected Federally-Insured Financial Institutions

49.     Wells Fargo FX sales specialists accomplished this scheme to defraud its commercial customers by developing and communicating the fraudulent representations and other statements alleged herein utilizing interstate mail carriers and interstate wires, including, but not limited to, emails, telephones, facsimiles, and the internet.

50.     The fraud perpetrated by Wells Fargo described herein affected many federally-insured financial institutions and/or their affiliates who had fixed-pricing agreements with the Bank.  Specifically, as alleged above, Wells Fargo defrauded the 771 Customers  by repeatedly charging these customers higher spreads than Wells Fargo FX sales specialists represented that the Bank would charge in fixed-pricing agreements or otherwise.  A number of the customers are federally-insured financial institutions or affiliates of such institutions whom Wells Fargo fraudulently overcharged.

51.     Wells Fargo, which itself is a federally-insured financial institution, has also been affected by the fraud the Bank perpetrated, through its employees, on its commercial customers who used the Bank's FX service.  In particular, this fraudulent conduct exposed Wells Fargo to loss and increased risk of loss associated with, among other things, litigation with customers and/or shareholders, administrative, civil, and/or criminal liability to governmental entities, reputational harm, loss of customer goodwill, and negative impacts to stock price.

## CLAIMS FOR RELIEF

### Count I:  Civil Penalties under 12 U.S.C. § 1833a (FIRREA)

#### Violations of 18 U.S.C. §§ 1341 and 1343 (Mail and Wire Fraud)
#### Affecting a Federally-Insured Financial Institution

52.    The allegations in each of the foregoing paragraphs are realleged and incorporated in this paragraph by reference.

53.    Wells Fargo devised and engaged in a scheme or artifice to defraud the Customers or obtain money or property from the Customers by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice.

54.    Specifically, Wells Fargo defrauded the Customers by falsely representing to the Customers in fixed-pricing agreements or otherwise that the Bank would charge and/or was charging certain fixed FX spreads or sales margins on the Customers' FX transactions with the Bank, while systematically charging the Customers higher spreads or sales margins and concealing such overcharges from the Customers.  Wells Fargo's representations and/or promises concerning the spreads or sales margins the Bank would charge and/or was charging on the Customer's FX transactions were material.  In perpetrating this scheme or artifice to defraud, Wells Fargo acted knowingly, willfully, intentionally, with deliberate indifference to the truth, and/or with the intent to harm the Customers by unlawfully obtaining their money or property. Wells Fargo used interstate mail carriers and interstate wires in connection with the scheme or artifice to defraud the Customers in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

55.    Wells Fargo's violations of the mail and wire fraud statutes have affected a number of federally-insured financial institutions and/or their affiliates, including a number of Customers who were defrauded by the Bank, as well as Wells Fargo itself, which has been

15

exposed to loss and increased risk of loss associated with liabilities to governmental entities, liabilities to customers, reputational harm, loss of customer goodwill, and negative impacts to stock price.

56.     Accordingly, Wells Fargo is liable for civil penalties to the United States in the maximum amount authorized under 12 U.S.C. § 1833a.

**Count II:  Civil Penalties under 12 U.S.C. § 1833a (FIRREA)**

**Violations of 18 U.S.C. § 1344 (Bank Fraud)**

57.     The allegations in each of the foregoing paragraphs are realleged and incorporated in this paragraph by reference.

58.     Wells Fargo knowingly executed a scheme or artifice to defraud financial institutions and/or to obtain the moneys, funds, assets, or other property owned by, or under the custody or control of, financial institutions, by means of false or fraudulent pretenses, representations, or promises.

59.     Specifically, Wells Fargo defrauded the Customers, a number of which are financial institutions, by falsely representing to them in fixed-pricing agreements or otherwise that the Bank would charge and/or was charging certain fixed FX spreads or sales margins on the Customers' FX transactions with the Bank, while systematically charging the Customers higher spreads or sales margins and concealing such overcharges from the Customers.  Wells Fargo's representations and/or promises concerning the spreads or sales margins the Bank would charge and/or was charging on the Customer's FX transactions were material.  In perpetrating this scheme or artifice to defraud Customers that are financial institutions, Wells Fargo acted knowingly, willfully, intentionally, with deliberate indifference to the truth, and/or with the

intent to harm these Customers by unlawfully obtaining their money or property in violation of the bank fraud statute, 18 U.S.C. § 1344.

60.    Accordingly, Wells Fargo is liable for civil penalties to the United States in the maximum amount authorized under 12 U.S.C. § 1833a.

## REQUESTED RELIEF

WHEREFORE, the United States requests judgment against Defendant as follows:

(i)  With respect to Count I, seeking civil penalties under FIRREA for violations of the mail and wire fraud statutes affecting a federally-insured financial institution, a judgment imposing civil penalties against Defendant up to the maximum amount allowed by law;

(ii)  With respect to Count II, seeking civil penalties under FIRREA for violations of the bank fraud statute, a judgment imposing civil penalties against Defendant up to the maximum amount allowed by law; and

(iii)  For costs of suit and such further relief that the Court deems just and proper.

Dated:      September 27, 2021
            New York, New York

Respectfully submitted,

AUDREY STRAUSS
United States Attorney
Southern District of New York

By:    _Lauren H. Fogel_

LAWRENCE H. FOGELMAN
PIERRE G. ARMAND
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2719/2724
E-mail:  Lawrence.Fogelman@usdoj.gov
         Pierre.Armand@usdoj.gov

17