**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

            Plaintiff,

            v.

WELLS FARGO BANK, N.A.,

            Defendant.

Case No. 21 Civ. _____

**STIPULATION AND ORDER OF**
**SETTLEMENT AND DISMISSAL**

WHEREAS, this Stipulation and Order of Settlement and Dismissal (the "Stipulation") is entered into by and among plaintiff the United States of America (the "United States" or the "Government"), by its attorney Audrey Strauss, United States Attorney for the Southern District of New York, and defendant Wells Fargo Bank, N.A. ("Wells Fargo," the "Bank," or "Defendant," and together with the United States, the "Parties"), through their respective authorized representatives;

WHEREAS, Wells Fargo is a federally-insured financial institution with headquarters located in Sioux Falls, South Dakota;

WHEREAS, Wells Fargo offers, among other financial products and services, foreign currency exchange ("FX") services to commercial customers located throughout the United States, including customers located in the Southern District of New York;

WHEREAS, on or about September 27, 2021, the United States filed a civil fraud complaint in the Southern District of New York against Wells Fargo (the "Complaint") alleging that Wells Fargo is liable to the United States for civil monetary penalties under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 18 U.S.C. § 1833a, for engaging in the following conduct: from 2010 through 2017 (the "Covered Period"), Wells Fargo

defrauded 771 commercial customers (the "Customers") who used the Bank's FX services, many of them small or medium-sized businesses or federally-insured financial institutions, in violation of the mail fraud, wire fraud, and bank fraud statutes, 18 U.S.C. §§ 1341, 1343, 1344, by (i) falsely representing to the Customers that the Bank would charge and/or was charging certain fixed FX spreads or sales margins to the customers' FX transactions (which the Bank sometimes referred to internally as "fixed-pricing agreements"), (ii) financially incentivizing its FX sales specialists to overcharge FX customers while failing to take steps to ensure that FX sales specialists would comply or were complying with fixed-pricing agreements, and (iii) systematically charging the Customers higher FX spreads or sales margins than Wells Fargo represented it would charge and/or was charging in fixed-pricing agreements or otherwise, while concealing the overcharges from the Customers and obtaining millions of dollars in FX revenue to which the Bank was not entitled (the conduct described in this Paragraph shall be defined as the "Covered Conduct" for purposes of this Stipulation);

WHEREAS, Wells Fargo affirms that, after the United States Attorney's Office for the Southern District of New York commenced its investigation of the Covered Conduct and prior to Wells Fargo's execution of this Stipulation, the Bank paid a total of $35,337,319.90 in restitution (the "Restitution Amount") to the Customers; and

WHEREAS, the Parties have, through this Stipulation, reached a full and final mutually agreeable resolution addressing the claims asserted against Wells Fargo in the Complaint for the Covered Conduct;

NOW, THEREFORE, upon the Parties' agreement, IT IS HEREBY ORDERED that:

## TERMS AND CONDITIONS

1.      The Parties agree that this Court has subject matter jurisdiction over this action

and consent to this Court's exercise of personal jurisdiction over each of them.

2.      Wells Fargo admits, acknowledges, and accepts responsibility for the following

conduct:

a.      During the Covered Period, Wells Fargo offered FX services to its customers, many of which were small or medium-sized businesses or federally-insured financial institutions located throughout the United States.  For example, when customers needed to send wire transfers overseas, Wells Fargo would convert the customers' US dollars into foreign currency.  Likewise, when customers received wire transfers from overseas, Wells Fargo would convert foreign currency into US dollars.

b.      Wells Fargo profited from conducting FX transactions with its customers by marking up the prices on currency it was selling and marking down the prices on currency it was buying from customers for their outgoing and incoming wire transfers.  For example, in some instances, Wells Fargo might add a 0.5% (or 50 basis points) mark-up to the rate at which a particular currency was trading at the time of the transaction.  Wells Fargo employees referred internally to this currency mark-up as "sales margin" or a "spread."

c.      Wells Fargo incentivized its FX sales specialists to generate FX sales revenue by tying their bonuses exclusively to the amount of sales revenue they generated for the Bank from FX transactions.  Specifically, before 2017, Wells Fargo paid bonuses to FX sales specialists based upon the percentage of the FX sales revenue that each FX sales specialist and FX desk generated.

d.      Each year during the Covered Period, Wells Fargo paid hundreds of thousands of dollars in bonuses to various FX sales specialists based on FX revenue.  Some FX sales specialists received bonus compensation exceeding $1 million in a single year.

e.      In many instances, Wells Fargo entered into agreements with its customers governing the way in which the Bank priced their FX transactions.  Pursuant to such agreements, Wells Fargo's FX sales specialists represented that they would apply or were applying specific mark-ups or spreads to their FX transactions.  In some cases, the FX spread would be fixed for all of the customer's transactions.  In other cases, the FX spread varied based on, *inter alia*, the currency pair, transaction type, or the

amount of currency being exchanged.  Many of these agreements, which Wells Fargo employees internally referred to as "fixed-pricing agreements," were memorialized in writing, typically via email.  Other such agreements were oral in nature, where the FX sales specialist represented that the Bank would apply or was applying a particular fixed spread.  During the Covered Period, Wells Fargo entered into fixed-pricing agreements with hundreds of its customers.

f.  Wells Fargo's FX sales specialists frequently recorded the terms of these fixed-pricing agreements on an internal system called the Customer Management Reporting database or "CMR."  This database served as a repository of notes about FX customers and was accessible to Wells Fargo FX employees to determine how the Bank should price a given customer's FX transactions.  CMR notes sometimes included excerpts of emails between customers and the Bank establishing the fixed-pricing agreement.  Other CMR notes simply described the terms of a fixed-pricing agreement between the Bank and the customer.

g.  Many of Wells Fargo's customers used the Bank's online FX trading systems to exchange currency for outgoing wire transfers.  Two of the online FX trading platforms that Wells Fargo offered to customers were "FX Online," or "FXOL," and the "Commercial Electronic Office Wires" or "CEO Wires".  The FXOL and CEO Wires services operated in a similar way.  On each platform, the customer could login, make a request to exchange US dollars for another currency, and arrange to send that currency by wire transfer to a recipient overseas.  Wells Fargo would quote an exchange rate for the amount and type of currency, which the customer could accept or reject.  For spot trades, Wells Fargo disclosed only the "all in" FX rate to the customer, meaning Wells Fargo disclosed only the final FX rate, not the underlying market rate or the amount of sales margin/spread the Bank was charging for the transaction.  Accordingly, it was difficult for many customers who had fixed-pricing agreements with Wells Fargo to verify that the bank was in fact charging the represented sales margin on these transactions.

h.  When Wells Fargo received incoming wire transfers for its customers, referred to internally as "BSwift" wires, Wells Fargo frequently did not offer customers an exchange rate that they could accept or reject before executing the transaction.  Wells Fargo frequently did not inform customers of the time when Wells Fargo had received and converted the BSwift wires.  Rather, Wells Fargo would execute the FX transaction and later notify customers of the FX rate it had applied.  Without knowing when Wells Fargo received the wire transfers, or when the Bank executed the transactions, it was difficult for customers to verify whether Wells Fargo was complying with its pricing representations.

i.      During the Covered Period, many FX sales specialists overcharged hundreds of commercial customers by applying larger sales margins or spreads to customer FX transactions than they represented they would.

j.      Wells Fargo's own internal CMR database indicated that FX sales specialists were charging customers FX spreads that were higher than those the Bank had represented.  Certain CMR notes reflected that while a customer thought it would receive the rate that the Bank had represented to the customer, the Bank in fact charged the customer undisclosed higher spreads.  For example, an FX sales specialist stated in one CMR note concerning Customer A that there was an "agreement w/the customer" to charge "25 pips[1] on spot trades" but that the bank would "take 30-35 . . . if possible."  The FX sales specialist stated that the "customer still thinks pricing is the same."  The FX sales specialist went on to note that for certain transactions, the bank would "stay within [the]range of the day" and that if the transaction was "large," the bank "c[ould] take up to 25 pips from [the] high of the day."

k.      A Wells Fargo sales specialist stated in another CMR note concerning Customer B that the Bank was actually charging the customer "0.18 pips," despite the fact that the "customer thinks they are only charged 15pips."  In a second CMR note, a Wells Fargo FX sales specialist stated that the Bank was charging Customer C a spread of 1.4%, but that Customer C thought the Bank was charging a spread of only 1.25%.

l.      In some instances, FX sales specialists indicated in the CMR notes that they would take higher spreads than they had represented to the customers.  For example, in a CMR note concerning Customer D, an FX sales specialist wrote after the word "External," that Customer D and the Bank "agreed to .25%" as the spread that the Bank would apply to Customer D's FX transactions.  Contrary to this agreement, the FX sales specialist went on to indicate that the Bank would in fact charge a spread of between 0.30% and 0.50%, writing: "INTERNAL: Spread .30% OR range whatever is greater but ***Don't take more than .50% with range cap***."

m.      In certain instances, FX sales specialists charged customers at the outer boundaries of the range of price fluctuations of the currency pair that day rather than adhering to commitments to charge specific spreads, a practice sometimes referred to as "range of day" pricing.  Through this practice, FX sales specialists were able to generate larger spreads on FX transactions.

---

[1] A "pip," short for "point in percentage," is a standardized unit representing the smallest amount by which a currency pair can change.  It is usually 0.0001 for currencies quoted in U.S. dollars; thus, 25 pips on such a pair would equal 0.0025.

n.      In certain instances, when customers contacted the Bank to inquire about higher-than-agreed-upon pricing, FX sales specialists would give false explanations for the prices such as "time fluctuations" or other supposed events in the market.

o.      FX sales specialists internally discussed and even celebrated transactions resulting in larger FX spreads than agreed to with customers or transactions generating large FX revenue.  For example, FX sales specialists on Wells Fargo's San Francisco FX desk would celebrate transactions with large spreads or sales margins by ringing a bell located on the trading floor.  Other FX sales specialists would use expressions such as, "back the truck up," and "when in doubt, spread them out," to jokingly describe how Wells Fargo and its FX sales specialists were making money on transactions by charging large FX spreads, including larger FX spreads than agreed to with customers.  Another FX sales specialist referred to Wells Fargo's FX sales group as a "bucket shop."

p.      In a few cases, FX sales specialists provided customers false transaction data.  In one instance, an FX sales specialist represented to Customer E that it would charge a spread of 5 basis points on certain BSwift wire transactions.  Contrary to this agreement, the Bank actually charged higher spreads on a series of FX transactions.  Then, in email correspondence with representatives of Customer E, the FX sales specialist provided inaccurate market rate information to the customer to make the FX spread falsely appear consistent with the agreement terms.

q.      In another example, an FX sales specialist agreed to apply a 50 basis point spread to Customer F's FX transactions.  However, the FX sales specialist applied spreads of more than 50 basis points to a series of Customer F's transactions and then provided inaccurate trading data concerning the market rate to Customer F to make the FX spread falsely appear consistent with the agreement terms.

r.      For some customers, FX sales specialists also used what they internally called the "big figure trick" or the "transposition error game" to increase the FX sales margin by switching digits in the price of the transactions in a way that would cost customers more money.  For example, if the correct hypothetical price to purchase a Euro was 1.0123 dollars, an FX sales specialist would use the big figure trick to switch the price to 1.0213 dollars, thus taking more spread (in this example, an additional 89 basis points) from the customer.

s.      If caught by the customer, the FX sales specialist would claim that it was simply a mistake of adjusting the wrong digit in the price.  One FX sales specialist explained, "You can play the transposition error game if you get called out."  Another FX sales specialist noted to a colleague about a

previous transaction that a customer "didn't flinch at the big fig the other day.  Want to take a bit more?"

t.   At times, Wells Fargo's FX sales specialists charged the same customers different spreads depending on which representative of the customer happened to be involved in executing the trade.  Specifically, Wells Fargo's FX sales specialists would charge larger spreads on transactions requested by certain customer representatives thought to be less sophisticated or experienced in FX trading.  Wells Fargo was able to tailor FX pricing to particular customer representatives because the Bank's online trading platforms identified the individuals who were requesting FX trades.  This practice was referred to internally at Wells Fargo as "user-based pricing."

u.   For example, in 2010, an FX sales specialist consistently charged Customer G significantly larger spreads than the parties had agreed upon.  However, when an employee of Customer G who had a higher degree of sophistication or experience in FX trading was involved in executing the transaction, the FX sales specialist charged smaller spreads (albeit still sometimes larger than the agreed-upon spread).

v.   As noted above, because Wells Fargo generally did not provide immediate notice to customers when they received incoming wires, known as BSwifts, Wells Fargo's FX sales specialists took advantage of this time delay to charge higher spreads than the Bank had represented it would.

w.   For example, in a CMR note concerning Customer H, an FX sales specialist documented a "[r]ate agreement" at .10% for incoming wires, but contrary to the agreement, noted "if good ranges I may want to take a bit more."  The FX sales specialist gave an instruction that while she was traveling, the FX sales specialist covering the client should use the "range of day" and "big figure" pricing.

x.   An FX sales specialist in a written instant message to another sales specialist referred to the Bank's pricing of BSwift wire transfers as the "BSWIFT pinata." An additional FX sales specialist noted in a recorded call that she preferred to book her own BSwifts to stretch the spread and could take more spread because she was doing the pricing herself.  She observed that she could "dance around it" if the customer called with questions.

y.   Another FX sales specialist observed in an internal email communication that customers would not notice higher spreads on BSwift wires.  He wrote, after noting that he "bumped spreads up a pinch," that "these clients who are in the mode of just processing wires will most likely not notice

7

this slight change in pricing" and that it "could have a very quick positive impact on revenue without a lot of risk."

z.    Some FX sales specialists priced BSwift transactions based on the range of the day.

aa.    Prior to 2017, Wells Fargo failed to put meaningful or effective safeguards in place to ensure that FX sales specialists priced customer FX transactions in accordance with the terms represented in fixed-pricing agreements.  For example, during the Covered Period, Wells Fargo:

- had no meaningful or effective policies or procedures governing how fixed-pricing agreements should be negotiated, memorialized, recorded, or implemented;

- provided no training to FX sales specialists concerning fixed-pricing agreements;

- had no meaningful or effective process to systematically track the existence or terms of fixed-pricing agreements;

- had no systemic process in place to monitor whether FX sales specialists were pricing FX transactions in a manner that was consistent with fixed-pricing agreements;

- did not implement any electronic safeguards that would have prevented FX sales specialists from pricing transactions in a manner that deviated from fixed-pricing agreements; and

- did not conduct any audits or reviews of FX transactions to determine whether FX pricing matched fixed-pricing agreements until 2017.

* * * * *

bb.    As a result of the foregoing, Wells Fargo received millions of dollars from customers to which the Bank was not entitled.

cc.    Wells Fargo affirms that, beginning in 2017, the Bank undertook a comprehensive review of its historical and go-forward FX policies and practices, and took various steps in an effort to comply with industry best practices by enhancing, inter alia: (i) general disclosures to FX customers outlining Wells Fargo's methodology for FX pricing and how Wells Fargo is compensated, including clarifying that Wells Fargo does not offer fixed-pricing unless agreed to in a written pricing agreement signed by both parties; (ii) FX pricing policies and related trainings on FX pricing

8

agreements; (iii) standardized FX pricing agreement templates and processes for negotiating with customers, ensuring awareness and approval of FX business managers, and memorializing agreement terms in writing with the customer and in internal systems; (iv) technology solutions to monitor all transactions subject to FX pricing agreements to ensure adherence to agreement terms; and (v) enhanced reporting to FX business managers and related risk and compliance groups on monitoring and adherence.  Wells Fargo also took adverse employment actions against more than 20 Wells Fargo employees who were involved in the FX business, including various disciplinary actions and separation of employment.

3.      Wells Fargo shall make the following payments within fourteen (14) days of the Effective Date as defined below in Paragraph 25: (a) a payment to the United States in the sum of $35,337,319.90, plus interest as provided below, which shall constitute a civil penalty pursuant to FIRREA (the "Civil Penalty Amount"); and (b) a payment of $2,000,000.00, plus interest as provided below, which shall constitute money subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) (the "Forfeiture Amount"). The interest specified in this Paragraph shall be compounded annually at 1.63% accruing from May 28, 2021, to the date on which the Civil Penalty Amount and Forfeiture Amount are paid as specified in this Paragraph.  Wells Fargo shall pay the Civil Penalty Amount and Forfeiture Amount in accordance with instructions to be provided by the United States Attorney's Office for the Southern District of New York.

4.      Wells Fargo agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Stipulation.  Upon reasonable notice, Wells Fargo shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.  Wells Fargo

further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

5.      Subject to the exceptions in Paragraph 8 (concerning reserved claims), Paragraph 9 (concerning default), and Paragraph 12 (concerning bankruptcy proceedings), and conditioned upon Wells Fargo's full compliance with the terms of this Stipulation, including full and timely payment of the Civil Penalty Amount, the Restitution Amount, and the Forfeiture Amount, the United States releases Wells Fargo, including its parent, subsidiaries, predecessors, successors and assigns, from any civil or administrative monetary claim that the United States has for the Covered Conduct under FIRREA, the False Claims Act, 31 U.S.C. §§ 3729-33, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, and the common law theories of fraud, payment by mistake, and unjust enrichment.  For avoidance of doubt, this Stipulation does not release any current or former officer, director, employee, or agent of Wells Fargo from liability of any kind.

6.      Subject to the exceptions in Paragraph 8 (concerning reserved claims), Paragraph 9 (concerning default), and Paragraph 12 (concerning bankruptcy proceedings), and conditioned upon Wells Fargo's full compliance with the terms of this Stipulation, including full and timely payment of the Forfeiture Amount, and the entry of the Forfeiture Order by the Court, the United States, on behalf of itself, its officers, agencies, and departments, releases any claim the United States has under 18 U.S.C. § 981(a)(1) for the Covered Conduct.

7.      Wells Fargo fully and finally releases the United States, and its agencies, officers, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Wells Fargo has asserted, could have asserted, or may assert in the future against the United States, and its agencies, officers, employees, servants, and agents, related to the Covered Conduct and the United States' investigation, prosecution, and settlement thereof.

8.      Notwithstanding the releases given in Paragraphs 5 and 6 of this Stipulation, or any other term of this Stipulation, the following claims of the Government are specifically reserved and are not released by this Stipulation:

      a.      Any civil, criminal, or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code);

      b.      Any criminal liability;

      c.      Except as explicitly stated in this Stipulation, any administrative liability or enforcement right, including but not limited to the suspension or debarment rights of any federal agency;

      d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

      e.      Any liability based upon obligations created by this Stipulation; and

      f.      Any liability of individuals.

9.      Wells Fargo shall be in default of this Stipulation if it fails to make the required payments set forth in Paragraph 3 above on or before the due date for such payments, or if it fails to comply materially with any other term of this Stipulation that applies to it ("Default").  The Government will provide a written Notice of Default to Wells Fargo of

any Default in the manner set forth in Paragraph 24 below. Wells Fargo shall then have

an opportunity to cure the Default within seven (7) calendar days from the date of receipt

of the Notice of Default by making the payments due and paying any additional interest

accruing under the Stipulation up to the date of payment. If Wells Fargo fails to cure the

Default within seven (7) calendar days of receiving the Notice of Default ("Uncured

Default"), interest on the remaining unpaid balance shall thereafter accrue at the rate of

12% per annum, compounded daily from the date of Default, on the remaining unpaid

total (principal and interest balance). In the event of an Uncured Default, Wells Fargo

shall agree to the entry of a consent judgment in favor of the United States against Wells

Fargo in the amount of $37,337,319.90 as attached hereto as Exhibit A. Wells Fargo also

agrees that the United States, at its sole discretion, may (i) retain any payments

previously made, rescind this Stipulation, and reinstate the claims asserted against Wells

Fargo in the Complaint, or bring any civil and/or administrative claim, action, or

proceeding against Wells Fargo for the claims that would otherwise be covered by the

releases provided in Paragraph 5 and 6 above, with any recovery reduced by the amount

of any payments previously made by Wells Fargo to the United States under this

Stipulation; (ii) take any action to enforce this Stipulation in a new action or by

reinstating the Complaint; (iii) offset the remaining unpaid balance from any amounts due

and owing to Wells Fargo and/or affiliated companies by any department, agency, or

agent of the United States at the time of Default or subsequently; and/or (iv) exercise any

other right granted by law, or under the terms of this Stipulation, or recognizable at

common law or in equity. The United States shall be entitled to any other rights granted

by law or in equity by reason of Default, including referral of this matter for private

12

collection.  In the event the United States pursues a collection action, Wells Fargo agrees immediately to pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action.  In the event that the United States opts to rescind this Stipulation pursuant to this Paragraph, Wells Fargo waives and agrees not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that (i) are filed by the United States against Wells Fargo within 120 days of written notification that this Stipulation has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on January 17, 2017.  Wells Fargo agrees not to contest any offset, recoupment, and/or collection action undertaken by the United States pursuant to this Paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

10.     Wells Fargo waives and shall not assert any defenses Wells Fargo may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Stipulation bars a remedy sought in such criminal prosecution or administrative action.

11.     Wells Fargo, having truthfully admitted to the conduct set forth in Paragraph 2 hereof (the "Admitted Conduct"), agrees it shall not, through its attorneys, agents, officers, or employees, make any public statement, including but not limited to, any statement in a press release, social media forum, or website, that contradicts or is

13

inconsistent with the Admitted Conduct or suggests that the Admitted Conduct is not wrongful (a "Contradictory Statement").  Any Contradictory Statement by Wells Fargo, its attorneys, agents, officers, or employees, shall constitute a violation of this Stipulation, thereby authorizing the Government to pursue any of the remedies set forth in Paragraph 9 hereof, or seek other appropriate relief from the Court.  Before pursuing any remedy, the Government shall notify Wells Fargo that it has determined that Wells Fargo has made a Contradictory Statement.  Upon receiving notice from the Government, Wells Fargo may cure the violation by repudiating the Contradictory Statement in a press release or other public statement within four business days.  If Wells Fargo learns of a potential Contradictory Statement by its attorneys, agents, officers, or employees, Wells Fargo must notify the Government of the statement within 24 hours.  The decision as to whether any statement constitutes a Contradictory Statement or will be imputed to Wells Fargo for the purpose of this Stipulation, or whether Wells Fargo adequately repudiated a Contradictory Statement to cure a violation of this Stipulation, shall be within the sole discretion of the Government.  Consistent with this provision, Wells Fargo may raise defenses and/or assert affirmative claims or defenses in any proceeding brought by private and/or public parties, so long as doing so would not contradict or be inconsistent with the Admitted Conduct.

12.     In exchange for valuable consideration provided in this Stipulation, Wells Fargo acknowledges the following:

      a.     Wells Fargo has reviewed its financial situation and warrants that it is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and

548(a)(1)(B)(ii)(I) and shall remain solvent following payment of the Restitution Amount, Civil Penalty Amount, and Forfeiture Amount.

b. In evaluating whether to execute this Stipulation, the Parties intend that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Wells Fargo, within the meaning of 11 U.S.C. § 547(c)(1), and the Parties conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.

c. The mutual promises, covenants, and obligations set forth herein are intended by the Parties to, and do in fact, constitute a reasonably equivalent exchange of value.

d. The Parties do not intend to hinder, delay, or defraud any entity to which Wells Fargo was or became indebted on or after the date of any transfer contemplated in this Stipulation, within the meaning of 11 U.S.C. § 548(a)(1).

e. If Wells Fargo's obligations under this Stipulation are avoided for any reason (including but not limited to through the exercise of a trustee's avoidance powers under the Bankruptcy Code) or if, before the Civil Penalty Amount or Forfeiture Amount is paid in full, Wells Fargo or a third party commences a case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors seeking any order for relief of Wells Fargo's debts, or to adjudicate Wells Fargo as bankrupt or insolvent, or seeking appointment of a receiver,

15

trustee, custodian, or other similar official for Wells Fargo or for all or any substantial part of Wells Fargo's assets:

(1)     the United States may rescind the releases in this Stipulation and bring any civil and/or administrative claim, action, or proceeding against Wells Fargo for the claims that would otherwise be covered by the releases provided in Paragraphs 5 and 6 above; and

(2)     the United States has an undisputed, noncontingent, and liquidated allowed claim against Wells Fargo in the amount of $37,337,319.90, less any payments received pursuant to the Stipulation, provided, however, that such payments are not otherwise avoided and recovered from the United States by Wells Fargo, a receiver, trustee, custodian, or other similar official for Wells Fargo.

f.     Wells Fargo agrees that any civil and/or administrative claim, action, or proceeding brought by the United States under Paragraph 12(e) above is not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) because it would be an exercise of the United States' police and regulatory power. Wells Fargo shall not argue or otherwise contend that the United States' claim, action, or proceeding is subject to an automatic stay and, to the extent necessary, consents to relief from the automatic stay for cause under 11 U.S.C. § 362(d)(1). Wells Fargo waives and shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or

16

administrative claim, action, or proceeding brought by the United States within 120 days of written notification to Wells Fargo that the releases have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on January 17, 2017.

13.  Wells Fargo agrees as follows:

a.  Wells Fargo agrees that the Forfeiture Amount represents a substitute *res* for net proceeds obtained by Wells Fargo as a result of the Admitted Conduct and that the Forfeiture Amount is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).  Wells Fargo further agrees that this Stipulation may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint") that will be filed against the Forfeiture Amount in the United States District Court for the Southern District of New York.  Wells Fargo releases any and all claims it may have to such funds.

b.  Wells Fargo expressly consents to the forfeiture of the Forfeiture Amount to the United States and waives any challenge to the Civil Forfeiture Complaint, including but not limited to all constitutional and statutory challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.  Wells Fargo also waives service and notice of the Civil Forfeiture Complaint and consents to *in rem* jurisdiction as to the Forfeiture Amount.

c.      Upon approval of this Stipulation, Wells Fargo shall release any and all claims it may have to the Forfeiture Amount and execute such documents necessary to accomplish forfeiture of the funds.  Wells Fargo agrees that it will not file a claim with any Court or otherwise contest the civil forfeiture of the Forfeiture Amount and will not assist a third party in asserting any claim to the Forfeiture Amount.  Wells Fargo certifies that the funds used to pay the Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance.  Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this Stipulation.

d.      Wells Fargo agrees that the Forfeiture Amount shall be treated as a penalty paid to the United States government for tax purposes.  Wells Fargo agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local or foreign tax for the Forfeiture Amount.

14.    Wells Fargo agrees to the following:

a.      <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Wells Fargo and its present or former officers, directors, employees, shareholders, and agents in connection with:

(1)     the matters covered by this Stipulation;

(2)     the United States' civil investigation of the matters covered by this Stipulation;

18

(3)     Wells Fargo's investigation, defense, and corrective actions undertaken in response to the United States' civil investigation in connection with the matters covered by this Stipulation (including attorneys' fees);

(4)     the negotiation and performance of this Stipulation; and

(5)     the payments Wells Fargo makes to the United States or any other person or entity pursuant to this Stipulation, including but not limited to payment of the Restitution Amount, are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

b.    <u>Future Treatment of Unallowable Costs</u>: Unallowable Costs will be separately determined and accounted for by Wells Fargo, and Wells Fargo shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c.    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Within 90 days of the Effective Date of this Stipulation, Wells Fargo shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by Wells Fargo or any of its subsidiaries or affiliates from the United States.  Wells Fargo agrees that the United States, at a minimum, shall be entitled to recoup from Wells Fargo any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously submitted requests for payment.  The United States,

19

including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Wells Fargo's books and records and to disagree with any calculations submitted by Wells Fargo or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Wells Fargo, or the effect of any such Unallowable Costs on the amount of such payments.

15.    This Stipulation is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity except as otherwise provided herein.

16.    Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Stipulation.

17.    Any failure by the United States to insist upon the full or material performance of any of the provisions of this Stipulation shall not be deemed a waiver of any of the provisions hereof, and the United States, notwithstanding that failure, shall have the right thereafter to insist upon the full or material performance of any and all of the provisions of this Stipulation.

18.    This Stipulation is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Stipulation is the United States District Court for the Southern District of New York.  The Court will retain jurisdiction over the enforcement and interpretation of this Stipulation and to resolve all disputes arising hereunder.

19.     For purposes of construing this Stipulation, it shall be deemed to have been drafted by the Parties, and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

20.     This Stipulation constitutes the entire agreement between the Parties with respect to the subject matter thereof.  This Stipulation may not be amended except by written consent of the Parties.  No prior agreements, oral representations or statements shall be considered part of this Stipulation.

21.     The undersigned counsel and other signatories represent and warrant that they are fully authorized to enter into this Stipulation on behalf of the persons and the entities indicated below.

22.     This Stipulation is binding on Wells Fargo's successors, transferees, heirs, and assigns.

23.     This Stipulation may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Stipulation.  E-mails that attach signatures in PDF form or facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Stipulation.

24.     Any notice pursuant to this Stipulation shall be in writing and shall, unless expressly provided otherwise herein, be delivered by hand, express courier, or e-mail transmission followed by postage-prepaid mail, and shall be addressed as follows:

TO THE UNITED STATES:

Lawrence H. Fogelman
Pierre G. Armand
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Email: Lawrence.Fogelman@usdoj.gov
          Pierre.Armand@usdoj.gov

TO WELLS FARGO:

David J. Rice                                    Jack M. Knight
Legal Department                                 John H. Cobb
Wells Fargo & Company                            Alan A. Stevens
One Wells Fargo Center                           Winston & Strawn LLP
301 South College Street, 30th Floor             300 South Tryon Street, 16th Floor
Charlotte, NC 28202-6000                         Charlotte, NC 28202
Email: David.J.Rice@wellsfargo.com               Email: JKnight@winston.com
                                                         JCobb@winston.com
                                                         AStevens@winston.com

25.    The effective date of this Stipulation is the date upon which this Stipulation is

approved and entered by the Court (the "Effective Date").

Agreed to by:

THE UNITED STATES OF AMERICA

Dated: New York, New York
      September 27 2021

                                  AUDREY STRAUSS
                                  United States Attorney for the
                                  Southern District of New York

By: _____
          LAWRENCE H. FOGELMAN
          PIERRE G. ARMAND
          Assistant United States Attorneys
          86 Chambers Street, Third Floor
          New York, New York 10007
          Tel.: (212) 637-2800
          *Attorneys for the United States of America*

WELLS FARGO BANK, N.A.

Dated:   Charlotte, North Carolina
~~September 24~~, 2021

By:  _____
JACK M. KNIGHT
JOHN H. COBB
ALAN A. STEVENS
Winston & Strawn LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: 704-350-7700
*Attorneys for Wells Fargo Bank, N.A.*

By:  _____
JONATHAN G. WEISS
Senior Executive Vice President
CEO of Corporate & Investment Banking
*Wells Fargo Bank, N.A.*

SO ORDERED:

HON.
UNITED STATES DISTRICT JUDGE

Dated: _____, 20__

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21 Civ. _____ |
| Plaintiff, | |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

## JUDGMENT

Upon the consent of plaintiff the United States of America and defendant Wells Fargo

Bank, N.A. ("Wells Fargo"), it is hereby

ORDERED, ADJUDGED and DECREED, that plaintiff the United States of America is

awarded judgment in the amount of $37,337,319.90 against Wells Fargo as well as post-

judgment interest at the rate of 12% per annum compounded daily.

Dated: New York, New York
      September ___, 2021

                                          AUDREY STRAUSS
                                          United States Attorney for the
                                          Southern District of New York

                           By:_____
                               LAWRENCE H. FOGELMAN
                               PIERRE G. ARMAND
                               Assistant United States Attorneys
                               86 Chambers Street, Third Floor
                               New York, New York 10007
                               Tel.: (212) 637-2800
                               *Attorneys for the United States of America*

Dated:  Charlotte, North Carolina
           September ___, 2021

<div style="margin-left:40%;">

WELLS FARGO BANK, N.A.

By:_____
      JACK M. KNIGHT
      JOHN H. COBB
      ALAN A. STEVENS
      Winston & Strawn LLP
      300 South Tryon Street, 16th Floor
      Charlotte, NC 28202
      Tel: 704-350-7700
      *Attorneys for Wells Fargo Bank, N.A.*


By:_____
      JONATHAN G. WEISS
      Senior Executive Vice President
      CEO of Corporate & Investment Banking
      *Wells Fargo Bank, N.A.*

</div>

SO ORDERED:


HON.
UNITED STATES DISTRICT JUDGE


Dated: _____, 20__